[No. 39013. En Banc. May 2, 1968.]

MAKAH INDIAN TRIBE et al., *Appellants,* v. CLALLAM COUNTY et al., *Respondents.**

*Reported in 440 P.2d 442.

*Ziontz, Pirtle & Fulle,* by *Robert L. Pirtle* and *Alvin J. Ziontz,* for appellants.

*The Attorney General* and *Robert P. Tjossem, Assistant,* for respondents.

HALE, J.—Will Rogers[1] once said that this country had never lost a war nor won a peace parley. Emerging victorious in a number of Indian wars, the United States parleyed and made numerous treaties with the Indian tribes and nations. Under the Treaty of 1855, 12 Stat. 939, the Makahs claim immunity on their reservation from personal property taxes. We think the Indians have won another parley.

Under the Treaty of 1855, the Makahs yielded their claims to the lands where they lived and roamed in exchange for a reservation on which to live, hunt, fish, plant and work. The Assessor of Clallam County now says he can tax personal property found on the reservation belonging to tribal members as he does that of any other person having taxable personal property in Clallam County. Contrarily, the Makahs say that the personal property of the tribe and individual tribal members, under the Treaty of 1855 and implementing legislation, is exempt from the tax. More precisely, the question is whether Clallam County can impose an ad valorem tax on personal property owned, kept and used by a tribal Makah on the Makah Indian Reservation in a commercial enterprise, which does business with non-Indians, when the Congress has not expressly authorized the tax.

Our first problem is to ascertain if plaintiff Esther H. Elvrum is a tribal Indian and a member of the Makah Tribe. She is of one-fourth Indian blood but was born and reared off the reservation. In 1928, she married Tom Elv-

---

[1]Will Rogers, 1879-1935, born in Oologah, Indian Territory, and reared in Oklahoma; American humorist, actor, and commentator on public affairs.

rum, a Caucasian having no tribal connections whatever with any Indian tribe. Between 1928 and 1941, Mr. and Mrs. Elvrum resided in Clallam Bay, a community neither on nor part of any Indian reservation, where Mr. Elvrum worked as a logger for Crown-Zellerbach Corporation. In 1941, the couple moved onto the Makah Indian Reservation in Clallam County for the express purpose of operating a cabin rental business there, while the husband continued his employment at Crown-Zellerbach in Clallam Bay, off the reservation.

Both the Makah Indian Tribe and Esther H. Elvrum now seek to enjoin the tax, alleging that the Makah Indian Tribe, incorporated under the Wheeler-Howard Act, 48 Stat. 984, had been officially recognized as exempt from such state taxation by the Federal Bureau of Indian Affairs. They aver that plaintiff Elvrum was a member of the tribe and owned a restricted trust allotment of real property on the Makah Reservation. Plaintiff Elvrum also alleged that she was an enrolled member of the Makah Tribe.

We do not find in this record where the defendants denied this averment of tribal membership or where they made any effort to overcome plaintiff Elvrum's testimony that she was an enrolled Makah Indian of one-quarter Indian blood. Her status as an enrolled Makah and a tribal Indian for this case would, therefore, be established were it not for the learned trial judge's findings and conclusions that a person of less than one-half Indian blood should not be exempt from taxation where the state and its subdivisions, as in the case of the Makahs, provide the Indians with important public services. The state and Clallam County have made available to the Makahs many tax-supported services, including public schools, aid through the Department of Public Assistance, hospitals and courts in cases of mental illness on the reservation, and the state judicial system in matters of juvenile delinquency and dependency and adoptions.

Plaintiff Elvrum's mother was an enrolled Makah Indian who lived off the reservation much of the time. By the

daughter's testimony, as plaintiff, her own enrollment in the official census of the Makah Tribe implied that quarter blood was deemed by the tribe as of sufficient blood degree to grant her tribal status as a member of the tribe. Neither the County of Clallam nor the State of Washington, through the Attorney General who entered the case on appeal, denied plaintiff's status as an enrolled Indian either by pleading a denial, offering evidence to the contrary, or requesting a reopening of the case to meet plaintiff's claim of Indian status. Accordingly, we must disagree with the learned trial court in its finding that Esther H. Elvrum, though admittedly of only one-fourth Indian blood, could not legally qualify as a tribal Indian.

Unless the county, before and during trial, or the state, through the Attorney General, gave notice to plaintiff either through pleadings or pretrial proceeding that they intended to deny plaintiff had been regularly enrolled by official census in the Makah Indian Tribe, she was, on her pleadings and testimony, *for the purposes of this case,* entitled to a finding that she held enrolled tribal status. Allegations of fact not effectively denied, either by pleadings or in a pretrial hearing or otherwise, are deemed admitted for the purposes of the cause on trial. Rule of Pleading, Practice and Procedure, 8 (d), RCW vol. 0, now CR 8 (d).

Since 1846—and perhaps earlier—the test of Indian status has depended primarily on two things (a) a substantial percentage of Indian blood and (b) recognition as an Indian. *United States v. Rogers,* 45 U.S. (4 How.) 567 (1846); *United States v. Ragsdale,* 27 F. Cas. 684 (D. Ark. 1847); *Ex parte Morgan,* 20 Fed. 298 (1883); *Westmoreland v. United States,* 155 U.S. 545, 39 L. Ed. 255, 15 Sup. Ct. 243 (1895); *Alberty v. United States,* 162 U.S. 499, 40 L. Ed. 1051, 16 Sup. Ct. 864 (1896). In 1934, the Congress, which has nearly plenary powers in the area of Indian legislation, codified the two standards, *i.e.,* Indian blood and recognition, into the definition of an Indian, adding a further requirement that to be an Indian the tribe through which one claims tribal status must, under federal jurisdiction, have been recognized as a tribe as of June 18, 1934:

> The term "Indian" . . . shall include all persons of Indian descent who are members of any *recognized* Indian tribe *now* under Federal jurisdiction . . . . (Italics ours.) Wheeler-Howard Act § 19, June 18, 1934, 48 Stat. 988.

No one here questions that before June 18, 1934, the Makahs were recognized as an Indian tribe under federal jurisdiction. Plaintiff Elvrum, thus, for the purposes of this action, established that she was an enrolled member of that tribe and hence a tribal Indian of the Makahs.

In 1855, as earlier noted, the Makah Indians by treaty ceded to the United States all claims to ownership of the lands wherein they had roamed and lived, but reserved the Makah Indian Reservation. The treaty was ratified by the United States Senate March 8, 1859. It was proclaimed by President James Buchanan April 18, 1859. 12 Stat. 939. Under the treaty, fee title to the lands of the reservation, as altered by law from time to time by means of presidential executive orders (October 26, 1872, January 2, 1873 and April 21, 1873, 1 Indian Affairs Laws and Treaties 917 (1902)), were and are held in trust by the United States of America for the use and benefit of the Makah Indian Tribe and its members. That the United States, under article 1, section 8 of the United States Constitution retains exclusive plenary jurisdiction over the tribe and reservation has been recognized by this court in *State ex rel. Adams v. Superior Court,* 57 Wn.2d 181, 356 P.2d 985 (1960), a ruling in keeping with article 26 of the state constitution declaring that

> Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States . . . .

The tax which Clallam County now seeks to levy and collect is a personal property ad valorem tax applicable to all nonexempt property found within Clallam County. Although not conceding an immunity derived from its location on the reservation, the county urges that it is community property of the parties under the management and control of the husband, a non-Indian, and, therefore, for tax purposes its location on the reservation is immaterial.

The Elvrums married in 1928. In 1942, Esther's mother gave her $1,000; in 1944, Esther bought trust lands on the reservation, renting them from time to time to tourists. In 1948, she built four cabins on the trust lands which she rented to sports fishermen and tourists. She borrowed $2,000 from the Makah Tribal Industrial Assistance Fund on her credit as a tribal member and used the money for her business enterprise on the reservation. In 1953, she leased land from the Makah Tribe on which she built a restaurant. In 1959, she built a motel, using $35,000 borrowed from a bank in Port Angeles; in 1962, she borrowed $12,000 more from the bank for use in the business, both she and her husband signing notes and a real-estate mortgage to secure the two loans.

For many years preceding the commencement of this action and until his retirement in 1958, Mr. Elvrum worked off the reservation as a logger, and his wife operated the restaurant and motel on the reservation, but they lived together on the reservation as a marital community. Thus, except for the $1,000 gift from the mother to the daughter, all of the business enterprise of the Elvrums would be community property under RCW 26.16.030.

All of the property which Clallam County seeks to tax under RCW 84.04.080, for the purposes of this action, should be regarded as personal property in the form of removable buildings and structures and their contents, including furniture, furnishings, restaurant furniture and equipment, motel furniture and furnishings. All of it was continuously kept, maintained and used with the authorization of the tribe within and upon the Makah Indian Reservation as a business enterprise by a tribal Indian wife. Even though the husband is a non-Indian and the property otherwise deemed to be community property, should it be held nontaxable because of its location and use on the reservation?

The status of this property, either under the community property statutes or under domestic relations or probate law, has little to do with its taxability here. Ascertaining its status in these areas of the law and the tenure in which

held between the spouses sheds little light on whether the county may tax it as personal property while it is permanently located in and used upon the Makah Reservation and under the dominion and control of a tribal Makah. The county and state argue that all of the Elvrum property, with a very minor exception, is community property, brought onto the reservation for business purposes and, therefore, it should be subject to the Clallam County tax the same as any other Elvrum community property of a taxable nature. This, of course, is quite a persuasive argument.

The property levied upon, as we have seen, consisted of (1) buildings erected on real estate held in trust by the United States for Esther Elvrum, (2) improvements on real estate held in trust by the United States for the Makah Tribe and leased to Esther Elvrum, and (3) equipment, furniture and furnishings used in connection with the improvements. Trust lands, whether held in trust for the tribe as an entity or for tribal Indians individually, are not taxable by the state or its subdivisions. It follows that personalty continuously held, kept, and used exclusively on the reservation is not taxable either unless the Congress decides otherwise, and, therefore, the distinction between the forms of property thus becomes immaterial in this case.

The quantum of ownership between spouses, regardless of their moiety, does not affect its taxability if the property is on an Indian reservation exclusively kept there during the taxable period and if it is under the management, control and ownership of a tribal Indian with the authority of the tribe, or under the ownership of the tribe. Under such circumstances, the taxable event upon which the tax is levied has not occurred within the territorial confines of Clallam County.

Mr. Elvrum, a Caucasian, married to a tribal Indian, was on the reservation by sufferance of the tribe. Without tribal permission, he could not lawfully reside there for Article 2 of the Makah Treaty of 1855, *supra,* referring to the Makah Reservation, expressly provides:

[N]or shall any white man be permitted to reside upon the same without permission of the said tribe . . . .

In 1936, the Makah Indian Tribe was incorporated under the Indian Reorganization Act, 48 Stat. 984, and adopted a tribal constitution which empowered the Makah Tribal Council in Article 6, § 1(g):

to exclude from the territory of the tribe persons not legally entitled to reside thereon, or trespassers upon the reservation . . . . Plaintiffs' exhibit No. 2.

That Mr. Elvrum resided with his wife on the reservation was a privilege accorded him by the tribe and not a right derived from his marriage. His residence there as a member of the community did not affect the taxability of the property kept, maintained and used exclusively on the reservation. That he might share indirectly in the tax immunity was an extra-legal circumstance, for, while the residence of the wife is ordinarily presumed to be that of the husband, the presumption here was clearly rebutted by proof of the wife's tribal status and her right to live on the reservation as a member of the tribe in contrast to her husband residing there only by permission of the tribe. The existence of a marital community on the reservation has no more effect on the taxability of property located there than would the spouse's status as an Indian affect the taxability of the same property if found, kept and used off the reservation.

According to the customs and usages of the Makahs, in a marriage between a Makah and a non-Indian, the Makah spouse has control of all of the property of the community which is kept on the reservation. Since, in our case, the husband's authority and management of the community property ended at the reservation boundary, and since his wife, as a member of the tribe, had control and management of it, the property for state tax purposes would be deemed personal property of a tribal Indian. Rules which would be applied in probate or domestic relations proceedings governing community property in superior court are clearly inapplicable here. Tribal customs and usage, when

not inconsistent with the civil law of the state, shall be given full force and effect in determination of civil causes. RCW 37.12.070. The custom and usage that a Makah spouse controls all of the community property kept on the reservation is not necessarily incompatible with the civil laws of this state since the property on the reservation should quite logically fall under the control of one who has a voice in the tribal government.

There exist other quite sound reasons why the property is not now taxable. In event of failure to pay an ad valorem tax, the property is subject to foreclosure and sale. An Indian would thus lose his property in clear contravention of federal policy that he keep it, use it and develop it. If the personal property of the Elvrum community were kept, maintained, and used off the reservation, it would be taxable as personal property even though one spouse was a tribal Indian; when kept, used and maintained on the reservation, it was not taxable as personal property by Clallam County, even though one spouse was a non-Indian.

The reasons for such a ruling lie almost exclusively in the discernible federal policy of encouraging Indians to become economically self-sufficient on their reservations. In some instances, the government even augments the policy by supplying the means. We are simply adapting this policy of encouragement to property acquired by the Indians as the fruits of their own work, labor and enterprise as well as to the property given by the United States in aid of tribal Indians.

In *United States v. Rickert*, 188 U.S. 432, 47 L. Ed. 532, 23 Sup. Ct. 478 (1903), the state of South Dakota sought to impose its personal property tax on a cow, horses and two wagons supplied by the United States to a tribal Indian to help the Indian in improving and utilizing his allotment of trust lands. Holding that this direct tax would not lie, the Supreme Court said:

> These suggestions entirely ignore the relation existing between the United States and the Indians. It is not a relation simply of contract . . . . The Government would not adequately discharge its duty to these people

if it placed its engagements with them upon the basis merely of contract and failed to exercise any power it possessed *to protect them in the possession of such improvements and personal property as were necessary to the enjoyment of the land held in trust for them.* (Italics ours.)

Although, in the instant case, the personal property sought to be taxed was not a gift or grant from the United States in aid of the Indian, but instead had been acquired through work, savings and borrowing, it was put to the modern equivalent usage by a tribal Indian. Instead of using horses, two wagons and a cow as in *Rickert* to develop and make profitable the allotment of land by grazing or farming it, the tribal Indian here used the property in a profitable business of providing food, lodging and equipment for sport fishermen, hunters and tourists—thus employing the personal property in adapting the land to one of the uses for which it was best suited. As we understand federal policy, it is as much the government's desire to foster successful business enterprises on the reservations as it is to encourage farming, ranching and fishing.

Certain state laws have been permitted to apply to activities on Indian reservations, where those laws are specifically authorized by acts of Congress, or where they clearly do not interfere with federal policies concerning the reservations. *Warren Trading Post Co. v. Arizona Tax Comm'n,* 380 U.S. 685, 687n.3, 14 L. Ed. 2d 165, 85 Sup. Ct. 1242 (1965).

Congress neither having specifically provided for the taxation by the state or its subdivisions of personal property owned by a Makah Indian, nor having impliedly granted such power, the ad valorem personal property tax by Clallam County may not be imposed upon personal property which is continuously used, kept and maintained on the Makah Reservation by a Makah Indian. Of course, Indians who live here are citizens of the state and of the United States, with all of the rights, privileges and immunities that citizenship carries. But they have additional rights, privileges and immunities vouchsafed them by contracts with

the United States, called treaties, and implementing federal legislation, not enjoyed by the descendants of the white settlers on whose behalf, in part, the United States negotiated and made treaties with the Indians' forbears.

Although the natural dignity of the American Indian as a person and a citizen, his valor as a warrior, and his contributions to this country, military and civil, cannot and ought not be denied, one wonders, as he reads the case law on Indian matters, whether the law has not conferred upon tribal Indians and their descendants what amounts to titles of nobility, with all that entails, in contravention of article 1, section 9, of the United States Constitution prohibiting such titles. But this is a question beyond our jurisdiction. That the Makahs will, while receiving most of the benefits of taxpayers and citizenship, escape some of the correlative responsibilities of citizenship is a problem for the Congress and the President to solve.

Accordingly, the cause is reversed with instructions to grant the order enjoining collection of the tax.

Finley, C. J., Hill, Weaver, Rosellini, Hunter, Hamilton, and Neill, JJ., concur.

June 21, 1968. Petition for rehearing denied.