[No. 43601. En Banc. October 23, 1975.]

CHIEF SEATTLE PROPERTIES, INC., ET AL, *Appellants*, v. KITSAP COUNTY, ET AL, *Respondents*.

*Philip P. Malone*, for appellants.

*John C. Merkel, Prosecuting Attorney*, for respondents.

HOROWITZ, J.—We are here principally concerned with the validity of the annual personal property tax imposed by RCW Title 84 from 1969 through 1972, upon a non-Indian's leasehold interest in Indian tribal land. Chief Seattle Properties, Inc., appeals a judgment upholding the validity of a proposed personal property tax against it on its lease and leasehold interest and on improvements on the land leased whether placed thereon or owned by the lessee, the transferee of the lessee's improvements or lessee's sublessees.

Appellant Chief Seattle Properties, Inc. (hereinafter also referred to as CSP), a Washington corporation, and the Suquamish Indian tribe of the Port Madison Indian Reservation, entered into a master lease in June 1967, covering approximately 36 acres of Indian tribal land. The fee to the land was vested in the United States, but held in trust for the Indians. The Suquamish Indian tribe was able to lease the land pursuant to 25 U.S.C. § 403a (1964), because the land was reserved to the Indian tribe from the conveyance of the fee to the United States of America, pursuant to the Treaty of Point Elliott (1855).

The lease provided for a term of 25 years, renewable for an additional 25-year term together with a number of detailed provisions generally protective of the tribe. These included provisions: (1) the lessee could sublease all or part of the lease premises; (2) all improvements placed upon the land by or for the lessee, its sublessees or assigns respectively, were to remain the property of the lessee, its sublessees or assigns as the case might be; (3) a sublessee had the right to remove his improvements within 60 days after the expiration of the term of his sublease; (4) the lessee had the right to remove its improvements within 60 days after the expiration of the term of its lease; (5) lessee improvements were not removable without approval of the Secretary of the Interior if the lease were terminated for cause prior to the expiration of the lease term; (6) the lessee agreed to pay when due and payable all taxes upon or against the leased land, the improvements, and all interest therein; (7) there were certain prohibitions against assignment of the lessee's interest.

In 1968 lessee began subdividing the lease premises and subleasing the lots to various private individuals. The subleases contained various provisions protective of the lessee-sublessor and sublessee including provisions that (1) all improvements placed on the land by the sublessee were to remain the latter's property except as otherwise provided; (2) the sublessee had the right to remove his improvements within 60 days after the expiration of the sublease,

but such improvements, exclusive of removable personal property, could not be removed without the written consent of the sublessor if the sublessee was in default under the sublease; (3) the sublessee would pay, when due and payable, all taxes levied upon or against all or part of the subleased land or interest therein, and improvements thereon, for which either the sublessee or lessee-sublessor became liable; (4) certain restrictions were placed on the assignment of the sublessee's interest.

In developing the leased land, CSP added improvements, including roads, water system, park, paths, dock and bulkheads. Later CSP transferred these improvements to Chief Seattle Maintenance Co., (hereinafter referred to as CSM), a nonprofit corporation composed of the sublessees of the various lots. CSM was empowered to maintain the improvements acquired and pay taxes thereon. An annual fee was payable by the respective sublessees to CSM.

The assessing and billing practices of the respondents Kitsap County Assessor and Kitsap County Treasurer are described in the court's findings. They show that in 1969 the assessor assessed the leasehold, allocating the value between CSP and the sublessees. In 1970 CSP was tax billed on the value of its "sandwich" lease and on the value of unleased lots; sublessees were billed individually on the value of their subleased lots and value of improvements thereon.

The same assessment and allocation method was used in 1970, and in 1971 CSP was tax billed for the value of the unleased lots and for the value of the "sandwich" lease, while sublessees were again billed for the value of their respective lots and improvements placed thereon.

In 1971 the same assessment value was used in assessing the value of the leasehold, but the "sandwich" lease was not assessed. The 1972 tax bill to CSP was based on the value of all the land whether subleased or not. Sublessees were tax billed only on the value of the improvements placed on their respective lots. The "sandwich" lease was not taxed in 1972.

In 1973 the Kitsap County Assessor took steps to tax bill CSP for the value of all lands and improvements, including sublessee improvements.

On April 13, 1972, CSP and the sublessees filed an application for alternative writ of mandamus to compel respondents to refrain from the listing, assessing or collecting all personal property taxes upon any leasehold interest and/or improvements owned by CSP and others on the land leased by CSP from the Suquamish Indian tribe, or to show cause why a writ of mandamus should not be issued and damages awarded. The county answered. Respondents later filed a motion to join CSM as a party plaintiff and a motion for leave to amend the answer to assert an affirmative defense, a counterclaim for damages, and for declaratory relief concerning the validity of taxing the leasehold estate in Indian tribal lands and the method of such taxation. Both motions were granted over objection. On April 27, 1973, and again on May 22, 1973, a judgment and summary judgment were respectively entered naming CSP as the proper taxpayer in 1969-72, inclusive, for payment of the personal property tax on the value of CSP's lease and leasehold interest, together with the improvements upon the lease and subleased lands. The summary judgment ordered a refund of personal property taxes paid by sublessees eligible for such refund and again named CSP as the proper taxpayer. Only CSP appeals the judgment as the aggrieved party.

CSP assigns a number of claimed errors. We limit ourselves to those arguments we deem controlling. Basically CSP principally argues: (1) the State lacks jurisdiction to impose the challenged personal property tax pursuant to RCW Title 84; (2) RCW Title 84 does not purport to impose the challenged personal property tax upon CSP at all; (3) the assessed values are erroneous; (4) the court erred in granting respondents' motion to permit joinder of CSM as an additional party and to permit respondents to plead an affirmative defense, and counterclaim for damages and declaratory relief. Respondents disagree with the arguments CSP advances to support reversal of the judgments

below. We shall consider the arguments in the order as stated. We do not find the arguments persuasive and affirm the judgments entered.

CSP contends the State of Washington lacks jurisdiction to impose the challenged personal property tax under RCW Title 84; during the 4-year period 1969-72 because CSP's lease and the improvements taxed are on Indian tribal land. Its basic supporting arguments are: (1) the State, by Const. art. 26, has disclaimed the power to impose this personal property tax without Congressional consent and that no such consent has been given; (2) independently thereof, the State lacks power to tax Indian tribal lands because the tax (a) interferes with Indian tribal sovereignty, (b) interferes with United States sovereignty, (c) unlawfully encumbers Indian tribal land by virtue of Washington's lien and distraint laws governing the collection of the personal property tax, (d) taxes property located outside of Kitsap County, (e) is a forbidden tax on CSP, a federal instrumentality.

 Indian tribal property in its various forms is property in which an Indian tribe has a legally enforceable interest. As used in this context the term refers to real property, the title to which is vested in the United States but held in trust for the Indian tribe. Such property, depending on the context in which the term is used, may or may not be "public property" of the United States. Indian tribal property is to be distinguished from real property allotted to individual Indians subject to a restraint against alienation or held in fee free from such restraint, or rights of Indians in personalty. United States Department of Interior, *Federal Indian Law* 583-92, 746, 773, 785, 818 (1958). F. Cohen, *Handbook of Federal Indian Law*, 183, 195, 287-91 (1971).

The Suquamish Indian tribe was organized under the laws of the United States. 48 Stat. 984 (1934). The tribe's Indian tribal land had long before been conveyed to the United States pursuant to the Treaty of Point Elliott of 1855, 12 Stat. 927. Article 2 of the treaty reserved a portion

of the land conveyed for the use and occupation of the tribe. The tribe, pursuant to federal statutes identified in the master lease, leased a part of its reserved land to CSP. *Federal Indian Law, supra* at 687-706; *Handbook of Federal Indian Law, supra* at 325-32. The parties agree that the entire property conveyed and leased is and has been held in trust by the United States for the Suquamish Indian tribe.

The question of state jurisdiction to tax reservation Indians has been a continuing problem. The rationale by which specific problems in this area have been resolved has changed. This change has reflected changes in federal policy. Sometimes the emphasis has been upon the separate and independent character of the Indian tribe; other times the emphasis has been upon the assimilation and integration of the Indian into the general community.

In *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 172, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973), the court said:

> [T]he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption. . . . The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power. . . .
>
> The Indian sovereignty doctrine is relevant . . . not because it provides a definitive resolution of the issues in this suit, but because it provides a backdrop against which the applicable treaties and federal statutes must be read.

(Footnotes omitted.)

In *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148, 36 L. Ed. 2d 114, 93 S. Ct. 1267 (1973), the court further stated:

> The conceptual clarity of Mr. Chief Justice Marshall's view in *Worcester v. Georgia*, 6 Pet. 515, 556-561 (1832), has given way to more individualized treatment of particular treaties and specific federal statutes, including statehood enabling legislation, as they, taken together, affect the respective rights of States, Indians, and the Federal Government. . . . [I]n the special area of

state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and *McClanahan v. Arizona State Tax Comm'n, supra*, lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent.

It is generally understood a state does not have jurisdiction to tax Indian tribal land. *Kansas Indians*, 72 U.S. (5 Wall.) 737, 18 L. Ed. 667, 673, 674 (1867); Const. art. 26; 25 Stat. 676 (1889); *Federal Indian Law, supra* at 850-53; *Handbook of Federal Indian Law, supra* at 256-57.

■ A different rule may apply when the state seeks to tax a non-Indian's personal property held on Indian tribal land. In *McClanahan* the court indicated that attempts by a state to tax non-Indians on an Indian reservation would be subject to the test of *Williams v. Lee*, 358 U.S. 217, 3 L. Ed. 2d 251, 79 S. Ct. 269 (1959). The *Williams* test provides that in transactions involving non-Indians, application of the state law will not be permitted if it would interfere with the right of Indians to make their own laws and be ruled by them. The court stated:

> It must be remembered that cases applying the *Williams* test have dealt principally with situations involving non-Indians. . . . In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected.

*McClanahan v. Arizona Tax Comm'n, supra* at 179.

Furthermore if the state tax imposed on an Indian or a non-Indian would substantially interfere with a discernible federal policy to aid the Indian, the tax would be invalid. *Sohol v. Clark*, 78 Wn.2d 813, 479 P.2d 925 (1971); *Makah Indian Tribe v. Clallam County*, 73 Wn.2d 677, 440 P.2d 442 (1968). The interference may not be treated as substantial if it is too remote to be legally sufficient to invalidate the tax.

In *Agua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184 (9th Cir. 1971), *cert. denied*, 405 U.S. 933, 30 L. Ed. 2d 809, 92 S. Ct. 930 (1972), a state possessory interest tax of a non-Indian on Indian reservation land was upheld on the theory the tax was assessed only against the lessee's interest in the land and not on the land itself, even though the land's rental value was decreased by the tax. The court stated at page 1186:

> [I]t is clear since United States v. City of Detroit [355 U.S. 466, 2 L. Ed. 2d .424, 78 S. Ct. 474 (1958)] that "the imposition of an increased financial burden on the Government does not, by itself, vitiate a state tax" and that the tax imposed upon the use of property is something distinct from a tax imposed upon the property itself.

The court specifically noted the position taken by Holmes, J., in *Gillespie v. Oklahoma*, 257 U.S. 501, 66 L. Ed. 338, 42 S. Ct. 171 (1922), that " 'A tax on the leases was a tax upon the power to make them and could be used to destroy the power to make them' " was rejected in *Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342, 93 L. Ed. 2d 721, 69 S. Ct. 561 (1949). In *Sohol v. Clark, supra,* the court in dealing with the analogous case of allotted and restricted Indian lands recognized that principle on page 817 n.1. The court stated:

> It is no longer the rule that a tax upon the leasehold interest of one who leases allotted and restricted Indian lands is a tax upon the power to lease and thus promote destruction of that power. The theoretical burden which the tax imposes on such lands is too remote and indirect to justify immunity *for that reason alone*.

In various cases the federal courts have held that personal property owned by non-Indians but held on an Indian reservation or other Indian land, is subject to state taxation. *Oklahoma Tax Comm'n v. Texas Co., supra; Taber v. Indian Territory Illuminating Oil Co.*, 300 U.S. 1, 81 L. Ed. 463, 57 S. Ct. 334 (1937); *Montana Catholic Missions v. Missoula County*, 200 U.S. 118, 50 L. Ed. 398, 26 S. Ct. 197 (1906); *Wagoner v. Evans*, 170 U.S. 588, 42 L. Ed. 1154, 18

16

S. Ct. 730 (1898); *Thomas v. Gay*, 169 U.S. 264, 42 L. Ed 740, 18 S. Ct. 340 (1898); *Agua Caliente Band of Mission Indians v. County of Riverside, supra*; *Truscott v. Hurlbut Land & Cattle Co.*, 73 F. 60 (9th Cir. 1896), *appeal dismissed*, 165 U.S. 719, 41 L. Ed. 1185, 17 S. Ct. 994 (1897); *Norvell v. Sangre de Cristo Dev. Co.*, 372 F. Supp. 348 (D.N.M. 1974); *United States v. Erie County*, 31 F. Supp. 57 (W.D.N.Y. 1939); *Federal Indian Law, supra* at 866; *Handbook of Federal Indian Law, supra* at 262-63.

As already noted, prior Washington cases involving the state's personal property tax have involved Indian taxpayers owning personal property on Indian land. *Makah Indian Tribe v. Clallam County, supra; Sohol v. Clark, supra*. In each of these cases the personal property tax was held invalid because the tax was believed to impair a federal policy to assist the Indian economically.

In the instant case, the personal property tax, as later pointed out, does not create a lien on the underlying fee held by the United States in trust for the Suquamish Indian tribe. The lien is on the personal property taxed, namely the master lease and leasehold interest together with the removable improvements which, as also later pointed out, are personal property. The master lease provides the lessee assumes the obligation to pay when due all taxes upon or against the lessee, the improvements and all interests thereon. The sublessees also agree to pay all taxes levied upon or against all or part of the improved lands or interest therein. There is no evidence the state personal property tax against CSP will frustrate or substantially impair the rights of tribal self-government or any discernible federal policy to protect the Indian against the challenged tax here. Any potential interference is too remote to require invalidation of the tax. *See Sohol v. Clark, supra; Agua Caliente Band of Mission Indians v. County of Riverside, supra*.

The parties in the instant case cite Pub. L. No. 83-280 (1953) under which the state assumed civil and

criminal jurisdiction over the Suquamish Indian tribe,[1] as if that law were dispositive of the issue of taxability. Public law 83-280 has been much discussed. *See* J. White, *Taxing Those They Found Here: An Examination of the Tax Exempt Status of the American Indian* 98-111 (1972); Goldberg, *Public Law 280: The Limits of State Jurisdiction Over Reservation Indians*, 22 U.C.L.A. L. Rev. 535 (1975). Public law 83-280 becomes relevant to this case only if it is determined the tax sought to be imposed interferes with tribal self-government or a federal policy to aid the Indians. We find no evidence of such interference during the tax years 1969-72. In the absence of such interference, the State's power to tax exists independently of public law 83-280 jurisdiction.

CSP relies on *Makah Indian Tribe v. Clallam County, supra*; *Sohol v. Clark, supra*; and *Snohomish County v. Seattle Disposal Co.*, 70 Wn.2d 668, 425 P.2d 22 (1967) to support its contention the challenged personal property tax is invalid. The cases are distinguishable. The first two involved taxation of personal property owned by an Indian and in each case the court concluded that to permit the tax would interfere with a discernible federal policy to promote economic development of the individual Indian. In *Snohomish County* the court invalidated a zoning restriction on the use of property upon which there was a restriction against alienation even though the property had been leased to non-Indians. The zoning restriction burdened the property itself. Here the tax is only upon the non-Indian's lessee's leasehold interest and can in no way affect the ownership interest of the Indian tribal land of the Suquamish Indian tribe.

It might be argued the personal property tax against a non-Indian's leasehold interest cannot be imposed because its collection by distraint and sale (RCW 84.56.070)

---

[1]While the Suquamish tribe did vote to come under state jurisdiction pursuant to RCW 37.12.021 effective July 14, 1958, the tribe later revoked the jurisdiction, with the Governor's approval, effective August 26, 1971. *Tonasket v. State*, 84 Wn.2d 164, 166-67 n.2, 525 P.2d 744 (1974).

would impair the ownership rights in Indian tribal land held in trust by the United States for the Indians and thus impair tribal sovereignty by interfering with the tribe's power to tax. The tax, however, is not forbidden to the State because it is not on the underlying land belonging to the Suquamish Indian tribe, nor does it impair tribal self-government including the tribe's power to tax. The taxes are assessed only upon personal property and are a paramount lien on the personal property assessed. RCW 84.60.010, .020. There is provision whereby the tax may become a lien upon real property of the person assessed: "selected by the county treasurer and designated and charged upon the tax rolls as provided in RCW 84.60.040, from and after the date of such selection . . ." RCW 84.60.020. However, the Indian tribal land held is not the real property of CSP in the required statutory sense.

Moreover, the remedy of distraint is a distraint of the personal property assessed as a result of which a lien has arisen. RCW 84.56.070. It will thus be seen that the remedy for the collection of the personal property tax is not a foreclosure of or distraint of the underlying land on which the improvements are erected. *See Agua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184 (9th Cir. 1971), *cert. denied*, 405 U.S. 933, 30 L. Ed. 2d 809, 92 S. Ct. 930 (1972); *Norvell v. Sangre de Cristo Dev. Co., supra; United States v. Erie County, supra.* The decisional law, under these circumstances permits the state to impose its personal property tax on a non-Indian's leasehold interest on Indian tribal land.

█ We find no basis for the contention the personal property tax on the personal property here is a forbidden tax on a federal instrumentality or that the tax is invalid because the personal property taxed is located outside Kitsap County. Under the doctrine of implied governmental immunity, a tax which interferes with a "federal instrumentality" is void. *Standard Oil Co. v. Johnson*, 316 U.S. 481, 86 L. Ed. 1611, 62 S. Ct. 1168 (1942). In *United States v. Rickert*, 188 U.S. 432, 47 L. Ed. 532, 23 S. Ct. 478 (1903),

the Supreme Court applied the instrumentality doctrine to Indian affairs and held that lands, some improvements and farm implements issued to the Indians by the United States were instrumentalities of the federal government and, therefore, immune from state taxation. Since then, however, the doctrine has been sharply limited with respect to Indians. Thus, in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 150, 36 L. Ed. 2d 114, 93 S. Ct. 1267 (1973), the court stated:

> The intergovernmental-immunity doctrine was once much in vogue in a variety of contexts and, with respect to Indian affairs, was consistently held to bar a state tax on the lessees of, or the product or income from, restricted lands of tribes or individual Indians. The theory was that a federal instrumentality was involved and that the tax would interfere with the Government's realizing the maximum return for its wards. This approach did not survive; its rise and decline in Indian affairs is described and reflected in *Helvering* v. *Mountain Producers Corp.,* 303 U. S. 376 (1938); *Oklahoma Tax Comm'n* v. *United States,* 319 U. S. 598 (1943); and *Oklahoma Tax Comm'n* v. *Texas Co.,* 336 U. S. 342 (1949), where the Court cut to the bone the proposition that restricted Indian lands and the proceeds from them were—as a matter of constitutional law—automatically exempt from state taxation. Rather, the Court held that Congress has the power "to immunize these lessees from the taxes we think the Constitution permits Oklahoma to impose in the absence of such action" and that "[t]he question whether immunity shall be extended in situations like these is essentially legislative in character." *Oklahoma Tax Comm'n* v. *Texas Co., supra,* at 365-366.

Therefore, location on an Indian reservation is not the test of taxability. Cases upholding a tax on the personal property on a non-Indian held on an Indian reservation do not support the contention advanced. *Oklahoma Tax Comm'n v. Texas Co., supra; Taber v. Indian Territory Illuminating Oil Co., supra; Montana Catholic Missions v. Missoula County, supra; Wagoner v. Evans, supra; Thomas v. Gay, supra; Agua Caliente Band of Mission Indians v. County of Riverside, supra; Truscott v. Hurlbut Land &*

20

*Cattle Co., supra; Norvell v. Sangre de Cristo Dev. Co., supra; United States v. Erie County, supra; Federal Indian Law, supra; Handbook of Federal Indian Law, supra.*

■ Concerning the contention the Port Madison Indian Reservation is not "within" Kitsap County or for that matter the state of Washington, it is far too late to make such a contention. In *Organized Village of Kake v. Egan*, 369 U.S. 60, 72, 7 L. Ed. 2d 573, 82 S. Ct. 562, 680 (1962) the court said:

> The general notion drawn from Chief Justice Marshall's opinion in *Worcester v. Georgia*, 6 Pet. 515, 561; *The Kansas Indians*, 5 Wall. 737, 755-757; and *The New York Indians*, 5 Wall. 761, that an Indian reservation is a distinct nation within whose boundaries state law cannot penetrate, has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations. By 1880 the Court no longer viewed reservations as distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law, *Utah & Northern R. Co. v. Fisher*, 116 U. S. 28, 31.

WHETHER RCW TITLE 84 PURPORTS TO IMPOSE A PERSONAL PROPERTY TAX AGAINST CSP'S LEASE AND LEASEHOLD INTERESTS INCLUDING IMPROVEMENTS ON THE LAND LEASED.

CSP contends RCW Title 84 does not purport to impose the personal property tax because Indian tribal land is involved. CSP principally argues: (1) RCW 84.04.080 defining personal property for purposes of the personal property tax applies only to public lands other than Indian tribal lands; and (2) the state law does not authorize the imposition of the tax against CSP on improvements it does not own, namely, the improvements CSP transferred to CSM and the sublessee improvements.

■ Personal property for personal property tax purposes as defined in RCW 84.04.080 includes:

> [A]ll leases of real property and leasehold interests therein for a term less than the life of the holder; all improvements upon lands the fee of which is still vested in the United States, or in the state of Washington . . .

CSP's lease with the Suquamish Indian tribe falls within this statutory definition of personal property. *See Clark-Kunzl Co. v. Williams*, 78 Wn.2d 59, 469 P.2d 874 (1970). Indeed, the statutory definition follows the decisional rule that "a leasehold interest in real estate is personal property, transferable as such." *Irons Inv. Co. v. Richardson*, 184 Wash. 118, 121, 50 P.2d 42 (1935). Furthermore, improvements respectively installed by the lessees and the sublessees and respectively removable by the lessees and sublessees during or following the termination of the lease or sublease, as the case may be, are personal property. *Sohol v. Clark*, 78 Wn.2d 813, 479 P.2d 925 (1971); *Makah Indian Tribe v. Clallam County*, 73 Wn.2d 677, 440 P.2d 442 (1968); Master Lease art. 8 and 32; Sublease art. 11 and 23.

Although not essential to our determination, it might be noted in passing that there is an added justification for imposing the personal property tax on the improvements. RCW 84.04.080 also defines personal property as "all improvements upon lands the fee of which is still vested in the United States . . ." Here, the fee to the Indian tribal lands is vested in the United States by virtue of the Treaty of Point Elliott. Accordingly, under RCW 84.04.080, the improvements, whether owned or erected by CSP or by the transferee CSM, or erected or owned by the sublessees, are all subject to the personal property tax. CSP contends, however, that the portion of RCW 84.04.080 last quoted applies only to public lands other than Indian tribal lands and that improvements thereon are therefore not taxable under the personal property tax. The statute purports to apply to the improvements on all lands without distinction as to the category if the fee to the land is still vested in the United States. Indian tribal lands have been construed in various contexts to be public lands. United States Department of the Interior, *Federal Indian Law*, 587-88 (1958).

CSP argues the definition of personal property as quoted from RCW 84.04.080 should be construed in light of RCW 84.36.010 exempting "All property belonging exclu-

sively to the United States . . ." The two statutes serve different purposes. It does not necessarily follow the exemption provided in RCW 84.36.010 should be construed in the same way as in the construction called for in the somewhat corresponding language contained in RCW 84.04.080. The word "exclusively" in RCW 84.36.010 does not prevent RCW 84.04.080 from operating in accordance with its own language. The fee to land held by the United States belongs exclusively to the United States even though the United States holds the fee in trust for the Indian tribe. The word "exclusively" in RCW 84.36.010, found in an exemption statute, was apparently intended to eliminate an exemption to one not entitled to an exemption notwithstanding he owns the land with the United States which is entitled to the exemption.

■ Overall, the fact that the legislature saw fit in 1973 to exempt from taxation leasehold interests on Indian land (RCW 84.36.450) suggests that but for the statutory exemption, the personal property tax statute was intended to cover such leasehold interest and improvements in the period 1969 through 1972. RCW 84.36.450. *See also Clark-Kunzl Co. v. Williams, supra; Pier 67, Inc. v. King County,* 78 Wn.2d 48, 469 P.2d 902 (1970).

WHETHER CSP IS THE PROPER TAXPAYER TO BE ASSESSED ON THE VALUE BOTH OF ITS MASTER LEASE AND LEASE IMPROVEMENTS FIRST OWNED AND THEN TRANSFERRED TO CSM AND ALSO ON THE VALUE OF SUBLESSEE IMPROVEMENTS OWNED BY THE SUBLESSEE.

The court below held CSP as master lessee should be billed the whole tax on the personal property tax regardless of the ownership of such property. In doing so it applied the so-called unit assessment rule described in *Pier 67, Inc. v. King County, supra;* and *Clark-Kunzl Co. v. Williams, supra. See also Alaska Land Co. v. King County,* 77 Wn.2d 247, 461 P.2d 339 (1969).

■ In *Clark-Kunzl Co. v. Williams, supra,* the court stated at pages 63-64:

Ad valorem property taxes are primarily in rem in

character. The tax is imposed against the property itself, not against the owners of the various interests in the land. When the fee interest is privately owned, a single tax is imposed on the entire estate. When title to the fee interest is owned by the state, and therefore tax exempt and indefeasible by tax lien, the taxable possessory interest must be taxed separately. The imposition of the tax on the possessory interest is effected by making the lessee personally obligated to pay the tax. This statutory framework, however, does not intend to create the very complicated fragmentization which would arise if each of a myriad of subleases under a long-term lease of highly developed state owned land were to be separately assessed and taxed as a possessory interest. *The unit assessment rule requires that a lease of state land must be assessed and taxed on the value of the primary leasehold as a unit. The county's attempt to assess the value of the sublease on the basis of the cost of the improvements and to assess this value separately from the value of the primary lease is not contemplated in our taxing structure.*

(Italics ours.)

The court also stated at page 63:

[A] lease is not to be assessed separately in determining the value of a parcel of real property for purposes of taxation. *Alaska Land Co. v. King County*, 77 Wn.2d 247, 254, 461 P.2d 339 (1969).

We there said:

 . . . [T]he tax assessor is required by the statutes to assess each parcel of real property with the improvements erected thereon, on the basis of its market value, without deduction for indebtedness; *and that where the land is leased, it is not his duty to apportion the taxes between the lessor and the lessee.*

(Italics ours.) Quoting from *Trimble v. Seattle*, 231 U.S. 683, 58 L. Ed. 435, 34 S. Ct. 218 (1914). The court further stated at page 63:

In ordinary cases the whole property is taxed and which party shall bear the burden is not a matter of public concern.

As pointed out in *Pier 67, Inc. v. King County, supra* at 54:

Further, the county argues it has a choice of taxing

improvements rather than the leasehold, even though the improvements are a lesser interest than the leasehold estate of which they are a part. This theory of fragmenting property interests for the purpose of assessment is contrary to the theory of unit assessment that the court announced in *Trimble v. Seattle*, 64 Wash. 102, 116 P. 647 (1911), *aff'd* 231 U.S. 683, 58 L. Ed. 435, 34 S. Ct. 218 (1914), and more recently in *Alaska Land Co. v. King County*, 77 Wn.2d 247, 461 P.2d 339 (1969), and *Clark-Kunzl Co. v. Williams*, 78 Wn.2d 59, 469 P.2d 874 (1970).

CSP contends the unit assessment rule operates unfairly because the rule operates to tax CSP on improvements it does not own. CSP is not without remedy nor has it blindly assumed the risk of taxation. Presumably CSP entered into the master lease aware of potential tax imposition on its leasehold and improvements. It was charged with knowledge of the law. It assumed the risk of taxability by the express language of the master lease. It protected itself against being taxed on sublessee improvements by the express language of each sublease. Moreover, CSM, the transferee of CSP's improvements, was expressly empowered to pay any tax upon the improvements transferred. Articles of Incorporation, art. 2, § 9. In any event, the wisdom of entering into the master lease is not a basis for invalidating the challenged personal property tax.

IF CSP IS TAXABLE, WHETHER THE KITSAP COUNTY ASSESSOR EMPLOYED A LAWFUL METHOD OF ASSESSMENT IN EACH OF THE ASSESSMENT YEARS 1969 THROUGH 1972.

CSP contends if the personal property tax is a valid tax, the assessment here is incorrect. The trial court upheld the method of valuation used by Kitsap County Assessor. The latter followed the valuation method approved by the State Department of Revenue. As respondents describe that method, the first step is to determine the full market value of the developed plat as if held in fee and then to deduct from that value the maintenance fee payable by each individual sublessee to CSM. From this resulting figure is deducted the total Indian interest, namely, (1) the right to receive annual rent reserved; and (2) the value of the

reversionary interest in the land ultimately receivable by the Indians. This total Indian interest is then deducted from the full market value, less annual maintenance fee, to arrive at the market value of CSP's leasehold interest.

CSP contends the valuation method so used is improper. CSP argues its valuation method testified to by its expert is correct. That method requires that the interest of the landlord, the master lessee and the sublessees should be separately identified and each interest valued separately. According to CSP's expert, it is necessary to value (1) the "lease fee interest" of the lessor; (2) the master lessee's interest in its "sandwich" lease, including the master lessee improvements and its interest in the leased unimproved realty, and; (3) the sublessees' interests including their interests in sublessee improvements. The total of these three interests, according to CSP's expert, add up to the fair market value of the property appraised.

Concerning the differences in values reached by the Kitsap County Assessor and CSP's expert, the latter testified on cross-examination as follows:

Q Fair market values in your method and in the Assessor's method for the property are substantially the same, except the Assessor is a little lower than you?

A Yes, I would say—yes; yes. I was thinking over individually. There's no major difference.

Q Your figures and computations and formulas are just based on the various interests, and they don't necessarily have anything to do with the way something should be taxed?

A That's correct.

Statement of facts, page 507, lines 10-18.

 These respective theories of valuation merely represent a difference in methods of appraisement. The assessor has a broad discretion to determine the proper method of appraisement. *Pier 67, Inc. v. King County, supra.* Under the findings of the trial court, the assessor took into account all the factors which, as a reasonably prudent man, he was required to consider. There is no evidence, and indeed no finding, the valuation arrived at by the Kitsap County As-

sessor was grossly excessive as required by *Alaska Land Co. v. King County, supra.* On the contrary, the court concluded:

That the Assessor's methods of arriving at assessments in the years 1969, 1970, 1971 and 1972 were not arbitrary or capricious nor contrary to law nor constructively fraudulent.

Conclusion of law No. 12. He further concluded that:

That the method of assessment used in 1969, 1970, 1971 and 1972 is a valid method of assessment.

Conclusion of law No. 13.

The assessments met legal standards, and the result was not a gross overvaluation of the property of CHIEF SEATTLE PROPERTIES, INC.

Conclusion of law No. 14.

CSP further contends the assessor erred because he failed to deduct rentals payable by CSP to the owner of the property, for the purpose of valuing CSP's leasehold interest. Such rent is not required to be deducted. *Pier 67, Inc. v. King County, supra.* It is true RCW 84.40.030, in dealing with assessments of taxable leasehold estates created by leasehold estates prior to January 1, 1971, for the years prior to 1973, requires the rent to be deducted. In this case, the testimony of the Kitsap County Assessor shows the rent payable under the master lease by CSP was deducted in arriving at the value of CSP's leasehold. Accordingly, by deducting the rent, the rent requirement imposed by RCW 84.40.030 was met.

We recognize that by assessing the entire personal property to CSP, difficulties will be created for CSP it might not have anticipated.

The court, however, as part of its declaratory relief concluded:

In the future a separate assessment should be made of each individual parcel and assessed to CHIEF SEATTLE PROPERTIES, INC. A separate assessment should be made of each improvement placed on a subleased lot by a sublessee and this value should be separately assessed to

CHIEF SEATTLE PROPERTIES, INC., subject, however, to the provisions of SHB 52, Laws of 1973.

Conclusion of law No. 25. The formal judgment was in part based on this conclusion. By such provision, CSP will be assisted in recovering from the sublessees the personal property taxes reimbursable to CSP by virtue of the tax clause in the respective subleases.

Furthermore, respondents' position below, in effect set forth in the prayers of their amended answers, was that CSP was entitled to credit on its tax obligation for personal property taxes paid by CSP's sublessees and held below to be nonreimbursable by Kitsap County. Although the findings, conclusions, and appealed judgments make no specific reference to this matter, we construe the determinations made below as made on the premise that such credit would be given. Respondents take no contrary position in their answering brief.

WHETHER THE TRIAL COURT ERRED IN GRANTING RESPONDENTS' MOTION PERMITTING THE JOINDER OF CSM AS AN ADDITIONAL PARTY, THE PLEADING OF AN AFFIRMATIVE DEFENSE, AND A COUNTERCLAIM FOR DAMAGES AND FOR DECLARATORY RELIEF, DEALING WITH THE SUBJECT MATTER EMBRACED BY THE PRECEDING THREE QUESTIONS.

Appellant contends the trial court improperly granted defendants' motion adding Chief Seattle Maintenance Co. as an additional party, because that corporation was never taxed and had no interest adverse to any of the other parties. Appellant also contends that the statutes relating to mandamus actions do not allow the addition of parties, nor permit the institution of an action for declaratory relief under the Uniform Declaratory Judgments Act, RCW 7.24. We find no error.

In *State ex rel. Close v. Meehan*, 49 Wn.2d 426, 432, 302 P.2d 194 (1956), the court stated:

An application for a writ of mandamus has in it all the elements of a civil action, and if issues of fact are raised, they may be tried before the court and an appropriate judgment entered upon the findings.

RCW 7.16.200 provides:

On the return of the alternative [writ], or the day on which the application for the writ is noticed, the party on whom the writ or notice has been served may show cause by answer, under oath, made in the same manner as an answer to a complaint in a civil action.

CR 81(a) provides:

Except where inconsistent with rules or statutes applicable to special proceedings, these rules shall govern all civil proceedings. Where statutes relating to special proceedings provide for procedure under former statutes applicable generally to civil actions, the procedure shall be governed by these rules.

We find no inconsistency between CR 81(a) and mandamus proceedings and therefore hold CR 81(a) applies. Moreover, we find no prejudice. Had the court denied the motions, thereby requiring an additional action to be instituted to determine the merits of this action, the court could have stayed the instant action pending institution of the additional action and the settlement of the pleadings therein. The court then could have ordered the cases consolidated for trial. The court acted within its discretion in making such additional procedure unnecessary by granting the motions. We find no abuse of discretion.

Affirmed.

STAFFORD, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.

Petition for rehearing denied January 7, 1976.