**WALKER RIVER PAIUTE TRIBE and Stephen King, Plaintiffs,**

v.

**John SHEEHAN et al., Defendants.**

**Civ. No. R–2888 BRT.**

United States District Court,
D. Nevada.

Dec. 14, 1973.

Thomas W. Fredericks, Daniel Israel, Yvonne Knight, of Native American Rights Fund, Boulder, Colo., and Paul H. Lamboley, Reno, Nev., for plaintiffs.

Robert List, Atty. Gen. of Nev., Carson City, Nev., for defendants.

## ORDER

BRUCE R. THOMPSON, District Judge.

This motion for a preliminary injunction was presented on a Stipulation of Facts, plus other evidence adduced at the hearing.

The agreed facts are as follows:

1. Plaintiff Walker River Paiute Tribe resides on the Walker River Res-

ervation which was created on March 19, 1874 by Executive Order for certain Paiutes residing within the Reservation. The Walker River Paiute Tribe adopted a Constitution and By-Laws in accordance with the Indian Reorganization Act of 1934. Plaintiff Stephen King is a duly licensed Indian trader authorized to do business in Indian Country pursuant to Federal Statute and Federal Regulations. In cooperation with and pursuant to a lease from the Walker River Paiute Tribe, Stephen King operates the Walker River Smoke Shop on the Walker River Paiute Indian Reservation and sells at retail unstamped cigarettes.

2. Defendant John J. Sheehan is the Executive Secretary of the Nevada Tax Commission and the other defendants are members of the Nevada State Tax Commission who, under Nevada law, are responsible for administering the tax provisions of Title 32, Nevada Revised Statutes. Effective July 1, 1973, Chapter 370 of Nevada Revised Statutes was amended to authorize the seizure of unstamped cigarettes passing into the State of Nevada under circumstances where the bill of lading on such cigarettes indicates that the consignee is a nonauthorized recipient of unstamped cigarettes within the State of Nevada. Defendants intend to enforce these seizure provisions, under appropriate circumstances, as to cigarettes purchased by plaintiff Stephen King while such cigarettes are passing through the State of Nevada on their way to the Walker River Reservation.

3. Stephen King regularly purchases cigarettes by prepayment from Bernstein Brothers of Portland, Oregon, a cigarette wholesaler, and these cigarettes are transported by common carrier without Nevada cigarette stamps affixed to the Walker River Reservation. The cigarettes are shipped from Portland, Oregon by Consolidated Freightways, Inc., a licensed interstate common carrier, located in Sparks, Nevada. Consolidated Freightways ships the cigarettes from Portland to the Pacific Motor Trucking Freight Dock in Reno, Nevada. Pacific Motor Trucking, Inc. is a licensed interstate common carrier operating in the State of Nevada which maintains a freight dock in Reno, Nevada. The cigarettes are loaded from the Pacific Motor Trucking Dock into carriers of Pacific Motor Trucking for transit to the Walker River Reservation. The cigarettes remain at the Pacific Motor Trucking Dock for several hours before they are sent out on the daily truck route to Hawthorne, Nevada. The truck makes one stop in Fallon, Nevada before reaching Schurz, Nevada on the Walker River Reservation. The cigarettes, while being shipped through the State of Nevada, are shipped in boxes identifying them as cigarettes, with freight bills attached showing the origin of the shipment as Portland, Oregon and the destination as Schurz, Nevada.

Chapter 370, Nevada Revised Statutes, comprises a comprehensive scheme for taxing all cigarettes held for resale. Generally, the law contemplates that a tax of ten cents per package will be assessed against cigarettes in the hands of licensed wholesalers in the State and that payment of the tax shall be evidenced by tax stamps affixed to each package before the cigarettes pass into the hands of retailers for distribution to the public. Retailers are permitted to purchase cigarettes only from a licensed wholesaler. The sale of untaxed and unstamped cigarettes is prohibited.

The 1973 Nevada Legislature amended the law in an effort to avoid the loophole involved in plaintiffs' activities. Senate Bill 364, approved April 25, 1973, provides as follows:

"Section 1. Chapter 370 of NRS is hereby amended by adding thereto the provisions set forth as sections 2 to 9.5, inclusive, of this act.

"Sec. 2. As used in this chapter, 'contraband cigarettes' means any cigarettes exported from or imported into this state by any person in violation of any of the provisions of this chapter or which are, in any way, held in the possession or constructive pos-

session of any person not authorized under this chapter to possess or constructively possess such cigarettes.

"Sec. 3. As used in this chapter, 'retail dealer' means any person who offers to sell cigarettes at retail or who is engaged in selling cigarettes at retail.

"Sec. 4. Except for a consumer, every person who transports cigarettes upon the public highways, roads or streets of this state shall have in his actual possession invoices or delivery tickets for such cigarettes, which shall show the true name and address of the consignor or seller, the true name of the consignee or purchaser and the quantity and brands of the cigarettes so transported.

"Sec. 5. 1. If any unstamped cigarettes are consigned to or purchased by any person in this state, such purchaser or consignee must be a person authorized by this chapter to possess unstamped cigarettes.

"2. If invoices or delivery tickets for unstamped cigarettes are lacking, if the name or address of the consignee or purchaser is falsified or if the purchaser or consignee is not authorized by this chapter to possess unstamped cigarettes, the cigarettes transported shall be subject to seizure and sale under the provisions of NRS 370.270.

"3. Transportation of cigarettes through this state from a point outside this state to a point in some other state is not a violation of this section if the person transporting the cigarettes has in his possession adequate invoices or delivery tickets which give the true name and address of the out-of-state seller or consignor and the out-of-state purchaser or consignee.

"4. In any case where the tax commission, its duly authorized agent or any peace officer or the state has knowledge of reasonable grounds to believe that any vehicle is transporting cigarettes in violation of this section, the tax commission, agent or peace officer may stop the vehicle and inspect it for unstamped cigarettes.

"Sec. 6. The tax commission, its agents, sheriffs within their respective counties and all other peace officers of the State of Nevada shall seize any contraband cigarettes found or located in the State of Nevada.

"Sec. 7. Any person exporting, importing, possessing or constructively possessing contraband cigarettes is guilty of a gross misdemeanor.

"Sec. 8. Any person other than a licensed wholesale dealer having in his possession cigarettes which do not bear cigarette revenue stamps as described in NRS 370.170 is guilty of a gross misdemeanor.

"Sec. 9. Any wholesale dealer who exports cigarettes, which do not bear revenue stamps as described in NRS 370.170, from Nevada to a person in another state who is not authorized by that state to possess such unstamped cigarettes is guilty of a gross misdemeanor.

"Sec. 9.5. Nothing in this chapter shall operate to abridge the rights of any Indian, individual or tribe, or to infringe upon the sovereignty of any Indian tribe, organized under the Indian Reorganization Act (25 U.S.C. § 476 et seq.)."

As disclosed by the evidence and the stipulated facts, it is the intention of defendants, pursuant to the foregoing statutory authority, to seize unstamped cigarettes shipped from Portland, Oregon to plaintiff King at Schurz, Nevada, while the transportation is temporarily interrupted at Reno, Nevada for transfer from one common carrier to another. An injunction against such threatened activity is sought, as well as declaratory relief.

Defendants challenge the right of plaintiffs to preliminary relief based

in part on this Court's lack of jurisdiction. Jurisdiction does, however, appear to exist under 28 U.S.C. § 1331(a). An "essential element" of the case is the question whether Article I, section 8, clause 3 of the Constitution protects cigarettes owned by the plaintiff Indians from state confiscation while in interstate commerce. This question turns on the interpretation and application of the Commerce Clause and, therefore, "arises under" the Constitution as required by Section 1331(a). See Gully v. First National Bank, 299 U.S. 109, 112–113, 57 S.Ct. 96, 81 L.Ed. 70 (1936).

Although the parties do not disclose the value of the threatened shipment of cigarettes, the jurisdictional amount appears to be satisfied by the value of lost taxes on the sale of the cigarettes (over $82,000 in the last thirteen months) and by the value of the lease between plaintiffs which largely depends for its performance on the sale of cigarettes.

Defendants also suggest that this Court should abstain. They contend that there is uncertainty regarding the interpretation of the present statute because the state courts have yet to construe Section 9.5 of the Act, which reads as follows:

> "Nothing in this chapter shall operate to abridge the rights of any Indian, individual or tribe, or to infringe upon the sovereignty of any Indian or tribe, organized under the Indian Reorganization Act (25 U.S.C. § 476 et seq.)."

■ If there is uncertainty as to the interpretation of this statute, it is with regard to the meaning of "rights" and "sovereignty" of Indians. There can, however, be no friction between federal law and state policy in this case because, as the following authorities reveal, the definition of the rights and sovereignty of Indians vis-a-vis the states, particularly with regard to state taxation of Indian activities, is a matter strictly controlled by federal law.

In Warren Trading Post Co. v. Arizona Tax Comm'n, et al., 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), the Court noted:

> "Certain state laws have been permitted to apply to activities on Indian reservations, where those laws are specifically authorized by acts of Congress, or where they clearly do not interfere with federal policies concerning the reservations." Warren, supra, footnote 3, p. 687, 85 S.Ct. p. 1243.

■ The propriety of a state act affecting Indian activities must, therefore, be determined by reference to federal laws and policies. With regard to state taxation on the reservation, the same case further held:

> "We think the assessment and collection of this tax would to a substantial extent frustrate the _evident congressional purpose_ of assuring that no burden shall be imposed upon Indian traders for trading with Indians on reservations _except as authorized by Acts of Congress or by valid regulations_ promulgated under those Acts." Warren, supra, at 691, 85 S.Ct. at 1245. (Emphasis added.)

Warren was followed by the recent decision in McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). That holding discusses the history and development of state jurisdiction over Indian affairs at considerable length (see 411 U.S. 167–173, 93 S.Ct. 1257, 36 L.Ed.2d 129). The Court notes that the states have been denied such jurisdiction based either on the sovereign immunity of Indian nations or on federal immunity extended to Indians as wards of the federal government. These principles have, however, been modified over time:

> "Finally, the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward a reliance on federal preemption * * *. The modern cases thus tend to avoid reliance on Platonic notions of Indian sovereignty and to look to the applicable treaties and statutes which define the limits of

state power." *McClanahan, supra*, at 172, 93 S.Ct. at 1262.

■■ The central abstention issue in the present case is whether state action against Indian-owned cigarettes infringes upon the rights or sovereignty of Indians. If uncertainty exists as to the meaning of Indian rights and sovereignty, its resolution depends on federal laws and treaties, not on questions of state law or policies. The abstention doctrine does not, of course, require that federal courts defer to state courts for interpretation of federal laws.

■ That abstention is inappropriate in these circumstances is the plain holding of Moses v. Kinnear, 490 F.2d 21 (9th Cir. 1973).

Nevada could not directly tax cigarette sales made on the reservation to either Indian or non-Indian purchasers.

The policies governing the relationship of the states to activities on Indian reservations have been in a state of flux. The history of this relationship is thoroughly examined in McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 167–173, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), and may be summarized as follows: The initial governing principle was "Indian sovereignty" which paid homage to the fact that the Indians comprised separate nations long before the United States was a gleam in George Washington's eye. This principle was formally recognized in the landmark decision of Worcester v. Georgia, 31 U.S. 515, 6 Pet. 515, 517, 8 L.Ed. 483 (1832). Later, Indians were exempted from state taxes under the aegis of the "federal instrumentality" doctrine; federal enclaves are immune from taxation by the state in which they are located. See, e. g., Leahy v. State Treasurer of Okla., 297 U.S. 420, 56 S.Ct. 381, 80 L.Ed. 404 (1936). Both of these concepts, however, have recently lost ground to the familiar rule of federal preemption. It is significant that *McClanahan* was unwilling to completely abandon Indian sovereignty in its assessment of state power

to tax Indians. As a result, the Court relied on an examination of federal statutes and treaties (federal preemption) placed against the "backdrop" of Indian sovereignty. *McClanahan, supra*, at 172, 93 S.Ct. 1257, 36 L.Ed.2d 129.

*McClanahan* held that Arizona could not impose its personal income tax on an individual reservation Indian's income which was solely derived from reservation activities. This holding was reached when a consideration of the original treaty with the tribe, the State enabling act, the Buck Act (4 U.S.C. §§ 106, 109), and 25 U.S.C. § 1322 (authorizing the states and Indians to agree to state jurisdiction over all reservation functions) satisfied the Court that federal law occupied the field in this area, precluding state jurisdiction to impose the tax.

*McClanahan's* important significance, however, probably lies in its reaffirmation of Warren Trading Post Co. v. Tax Comm'n, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). The Court there considered the power of Arizona to impose a tax on sales made by an Indian trader on a reservation to fellow Indians. The Court studied the relevant treaties and statutes and held:

> "Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." *Warren, supra*, at 690, 85 S.Ct. at 1245.

■ Both *Warren* and *McClanahan* take some care in identifying the facts limiting their respective holdings. Viewed in their most restricted scope, however, it is still clear that they at least stand for the proposition that the states lack jurisdiction to impose taxes on income of Indians derived from transactions with other Indians on the reservation unless an act of Congress expressly authorizes state taxation. Insofar as Nevada would directly attempt to place a tax on cigarettes sold by the Indian trader to members of the Walker River Tribe, that tax would be illegal.

■ The testimony at the hearing on this preliminary injunction revealed that as much as eighty per cent of the cigarettes sold are sold to non-reservation purchasers. Might this factor, in the light of the rather limited holdings in *Warren* and *McClanahan,* in some way operate to give the state authority to tax sales to non-Indians? We think not.[1]

An opinion of the Solicitor for the Interior Department (Op.Sol.I.D., M 30544, May 31, 1940, 57 I.D. 129) held that Wisconsin did not have jurisdiction to impose its cigarette tax on *any* sales of tobacco made on the reservation by the Menominee Indians. The Solicitor relied on the federal instrumentality and preemption principles in reaching this holding. In the same opinion, the Solicitor authorized the state taxation of sales of gasoline to non-Indian consumers because of the effect of an act of Congress on June 16, 1936 (49 Stat. 1521, 23 U.S. C.A. § 55a, now 4 U.S.C.A. § 104). This federal statute was, in the Solicitor's opinion, necessary to alter his holding (also enunciated in an Opinion at 57 I. D. 124) that "state sales taxes did not apply to purchases *from* or *by* Indians on Indian reservations." 57 I.D. at 140.

There is no federal statute authorizing Nevada taxation of Indian trader tobacco sales. Under the opinions of the Solicitor, therefore, purchases *from* the trader, as well as sales *to Indians,* are beyond the state's taxing power.

A decision that sales to non-Indians are protected from state taxation, as well as sales to Indians, is not, of course, precluded by *Warren* or *McClanahan.* Those decisions simply did not reach that question. (It should be noted with regard to *McClanahan,* however, that the plaintiff-Indian's entire personal income was held non-taxable. The Court did not distinguish between income earned from non-Indians and income earned from fellow Indians on the reservation.)

Nor is a holding placing sales to non-Indians outside state taxing power precluded by Mescalaro Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L. Ed.2d 114 (1973). It was there held that the state could place a sales tax on gross receipts of a ski resort owned and operated by a tribe of reservation Indians because the resort was not on the reservation. The Court said:

"In the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands *or Indian income from activities carried on within the boundaries of the reservation." Mescalaro, supra,* at 148, 93 S.Ct. at 1270. (Emphasis added.)

This is a broad statement supporting a holding that state taxing power does not reach Indian income from any source, Indian or non-Indian, earned on the reservation.

■ Nevada cannot interrupt the delivery of the cigarettes to the reservation to impose this tax on the sale of the cigarettes.

Any attempt to impose this tax on the sale of cigarettes by intercepting the shipment of the cigarettes to the reservation would constitute an unlawful interference with interstate commerce.

It is fairly obvious that the cigarettes are in interstate commerce. "Importation into one state from another is the indispensable element, the test, of interstate commerce." Lottery Case, 188 U. S. 321, 345, 23 S.Ct. 321, 47 L.Ed. 492, 322; United States v. Hill, 248 U.S. 420, 424, 39 S.Ct. 143, 63 L.Ed. 337 (1918). The cigarettes are purchased in Oregon and shipped from there to Nevada. It

---

1. It may not be necessary to reach a consideration of the distinction between sales to Indians and sales to non-Indians; the State has evidenced no intent to limit imposition of its tax to one source of sales or another. The point is raised out of respect for the

Court's efforts to limit its holdings in *Warren* and *McClanahan* to the narrow facts there presented. The Ninth Circuit also took notice of these narrowed holdings in Moses v. Kinnear, 490 F.2d 21, 26 decided Nov. 2, 1973.

is, therefore, clear that the cigarettes are imported from one state to another, thereby meeting the test for "interstate commerce."

The shipments of cigarettes are delivered initially to Reno, transferred from one truck and one carrier to another truck of another carrier, and then transported from Reno to Schurz, Nevada. Does this pause in the shipping chain break the flow of interstate commerce and subject the shipment to Nevada regulation:

"If the interstate movement has begun, it may be regarded as continuing, so as to maintain immunity of the property from state taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of movement * * *. Formalities, such as * * * mere changes in the method of transportation do not effect the continuity of the transit. The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied." Minnesota v. Blasius, 290 U.S. 1, 9–10, 54 S.Ct. 34, 37, 78 L.Ed. 131 (1933).

In this case, the "occasion or purpose" of the interruption is merely for a change in carriers. The purpose of the tax sought to be imposed is, however, aimed at the sale of the cigarettes. There is no sale of the cigarettes in Reno during the transfer from one truck to another. The pause in the flow of the shipment in interstate commerce does not, therefore, trigger the imposition of the tax. The pause is, rather, a mere suspension in the transportation of the property which does not forfeit the shipment's immunity from state taxation. See Blasius, supra, at p. 12, 54 S. Ct. 34, 78 L.Ed. 131, regarding the important distinction between suspending a shipment and ending it.

Taxation of the cigarettes prior to arrival in Schurz and the termination there of the interstate shipment would constitute state interference with interstate commerce.

"The States may not impose direct burdens upon interstate commerce, that is, they may not regulate or restrain that which from its very nature should be under the control of the one authority and be free from restriction save as it is governed in the manner that the national legislature constitutionally ordains. *This limitation applies to the exertion of the State's taxing power as well as to any other interference by the State with the essential freedom of interstate commerce* * * *. *Similarly, the States may not tax property in transit in interstate commerce.*" Blasius, supra, at 8–10, 54 S.Ct. at 36. (Emphasis added.)

Nevada may not tax the sales of the cigarettes on the Walker River Reservation nor may it attempt to impose the tax by interfering with the delivery of the cigarettes from Oregon to Schurz, Nevada. It would, therefore, appear that plaintiffs are likely to prevail on the merits of this case and, to that extent, are entitled to the preliminary injunction.

The evidence shows that the actions contemplated by defendants will destroy the business of the Indian Trader and will destroy the value of the lease between King and the Walker River Paiute Tribe. There is no adequate remedy at law and preliminary injunctive relief is appropriate in the circumstances. Accordingly,

It hereby is ordered that a preliminary injunction shall issue in accordance with the premises stated. Plaintiffs' counsel shall submit an appropriate form of preliminary injunction within ten (10) days.