**PEOPLE OF SOUTH NAKNEK et al., Plaintiffs,**

v.

**BRISTOL BAY BOROUGH et al., Defendants.**

No. A76–211 Civil.

United States District Court, D. Alaska.

March 6, 1979.

Alaska Legal Services Corp., David B. Snyder, James G. Robinson, Dillingham, Alaska, for plaintiffs.

Harland W. Davis, Anchorage, Alaska, for defendants.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on plaintiffs' motion for summary judgment. Oral argument has been requested but is denied in order to expedite the business of the court. Local Rule 5(C)(1).

This is an action to restrain the Bristol Bay Borough and officials of the Borough from assessing, levying and collecting real and personal property taxes from Alaskan Natives residing on restricted lands held in trust by the United States for the use and benefit of Alaskan Natives in the Village of South Naknek, Alaska. This suit is brought by the People of South Naknek, an Indian band duly recognized by the Secretary of the Interior, under 28 U.S.C. § 1362 (1976)[1] through their traditional Village Council pursuant to a resolution adopted by the duly assembled Council. The suit is also brought by individual Alaskan Natives residing on restricted land within the Village of South Naknek.[2] The restricted lands in question have been applied for or granted under the Alaska Native Townsite Act of 1926, 44 Stat. 629 (formerly 43 U.S.C. §§ 733–36 repealed by P.L. 94–579, 90 Stat. 2790),[3] and the Alaska Native Allotment Act of 1906, 34 Stat. 197 (formerly 43 U.S.C. § 270–1 to 270–3, repealed by P.L. 92–203; 85 Stat. 710).[4] On March 13, 1978,

---

1. 28 U.S.C. § 1362 states:

 The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

 See *Agua Caliente Band of Mission Indians v. Riverside County*, 442 F.2d 1184, 1185–86 (9th Cir. 1971) *cert. denied* 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972); *Moses v. Kinnear*, 490 F.2d 21, 24–26 (9th Cir. 1974).

2. The jurisdiction of this court is also based upon 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1353 (Indian allotments).

3. P.L. 94–579 (Federal Land Policy and Management Act) repealed the Alaska Native Townsite Act effective October 21, 1976, but provided a savings provision that "Nothing in this Act, or in any amendment made by this Act, shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this Act [October 21, 1976]." 90 Stat. 2786. This provision would preserve whatever rights the plaintiffs who are residents of the townsite of South Naknek had to the townsite lots.

4. P.L. 92–203 (Alaska Native Claims Settlement Act) repealed the authority for Native Allotments in Alaska but contained a savings clause for any allotment application pending

this court certified a class pursuant to Rule 23(b)(2), Fed.R.Civ.P., that includes "All Alaska Natives who possess or reside on restricted land on the south bank of the Naknek River within the boundaries of the Bristol Bay Borough, which land has been granted under the Native Townsite Act or the Native Allotment Act, or for which there is an application pending for a deed or patent to such lands under either of these acts."

Defendants presently levy real property taxes upon Alaskan Natives who own homes in townsite lots within the Native Townsite of South Naknek. Defendants also levy personal property taxes upon Alaskan Natives residing on Native Townsite lots and on Native Allotments. Defendants have taxed the improvements of Natives located on Native Allotments in the past but have ceased doing so. The legality of such taxation is relevant to plaintiffs' request for refunds for past taxes paid and therefore must also be decided on this motion.

■ The focus of the court's inquiry must be whether the power of the Borough to levy the taxes challenged in this case has been pre-empted by the relevant federal statutes, *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 147–48, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973); *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Fort Mo-jave Tribe v. San Bernardino Co.*, 543 F.2d 1253, 1255–56 (9th Cir. 1976). In reviewing these statutes the court must follow the general rule that statutes passed for the benefit of Indians are to be liberally construed, doubtful expressions being resolved in favor of the Indians. *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 89, 39 S.Ct. 40, 63 L.Ed. 138 (1918). *See also Bryan v. Itasca County*, 426 U.S. 373, 392–93, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). *Alaska Public Easement Defense Fund v. Andrus*, 435 F.Supp. 664, 671 (D.Alaska 1977). This rule of construction has particular force in determining whether Indians and their property enjoy tax immunity. *Squire v. Capoeman*, 351 U.S. 1, 6–7, 76 S.Ct. 611, 100 L.Ed. 883 (1956). *Bryan v. Itasca County, supra*, 426 U.S. at 392, 96 S.Ct. 2102.

There are three statutes relevant to the tax immunity question before the court. The Alaska Native Allotment Act stated that "the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise provided by Congress. . . ." 34 Stat. 197.[5] The Native Townsite Act provided that where a tract

> has been or may be set apart to such Indian or Eskimo, the town site trustee is authorized to issue to him a deed therefor which shall provide that the title conveyed is inalienable except upon the ap-

---

before the Department of Interior on the effective date of the Act, December 18, 1971. 85 Stat. 710.

5. Former 43 U.S.C. § 270–1 stated:

The Secretary of the Interior is authorized and empowered, in his discretion and under such rules as he may prescribe, to allot not to exceed one hundred and sixty acres of vacant, unappropriated, and unreserved nonmineral land in Alaska, or, subject to the provisions of sections 270–11 and 270–12 of this title, vacant, unappropriated, and unreserved land in Alaska that may be valuable for coal, oil, or gas deposits, to any Indian, Aleut, or Eskimo of full or mixed blood who resides in and is a native of Alaska, and who is the head of a family, or is twenty-one years of age; and the land so allotted shall be deemed the homestead of the allottee and his heirs in perpetuity, and shall be inalienable and nontaxable until otherwise pro-vided by Congress: *Provided*, That any Indian, Aleut, or Eskimo, who receives an allotment under this section, or his heirs, is authorized to convey by deed, with the approval of the Secretary of the Interior, the title to the land so allotted, and such conveyance shall vest in the purchaser a complete title to the land which shall be subject to restrictions against alienation and taxation only if the purchaser is an Indian, Aleut, or Eskimo native of Alaska who the Secretary determines is unable to manage the land without the protection of the United States and the conveyance provides for a continuance of such restrictions. Any person qualified for an allotment as aforesaid shall have the preference right to secure by allotment the nonmineral land occupied by him not exceeding one hundred and sixty acres. (May 17, 1906, ch. 2469, 34 Stat. 197; Aug. 2, 1956, ch. 891, § 1(a)–(d), 70 Stat. 954.)

proval of the Secretary of the Interior: *Provided*, That nothing herein contained shall subject such tract to taxation, to levy and sale in satisfaction of the debts, contracts, or liabilities of the patentee, or to any claims of adverse occupancy or law of prescription . . . ."

44 Stat. 629.[6] The Alaska Statehood Act provides

That no taxes shall be imposed by said State upon any lands or other property now owned or hereafter acquired by the United States or which, . . . may belong to said natives, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation.

P.L. 85–508, § 4, 72 Stat. 339.[7]

*Taxation of Improvements on Restricted Townsite Lots and Allotments*

 There is no question that the land held in trust for the plaintiffs under either the Native Townsite Act or the Native Allotment Act is exempt from local and state taxation. The Allotment Act commands explicitly that the land allotted shall be "nontaxable." The Townsite Act speaks in less explicit terms, stating that nothing in the Act "shall subject such tract to taxation." This language simply continues the tax status of the land before the Act provided for a means of conveying a restricted and inalienable deed to the Native townsite residents. Of course, before the land is conveyed to the townsite trustee or the Native it is held by the United States and is non-taxable. *McCulloch v. Maryland*, 4 Wheat 316, 17 U.S. 316, 4 L.Ed. 579 (1819). The Townsite Act continues this non-taxable status. Section four of the Alaska Statehood Act reaffirms this conclusion by withholding from the State any power to tax restricted lands. The beneficial interest of the Natives in the land within a restricted Native Townsite lot or a Native Allot-

6. Former 43 U.S.C. § 733 stated:

Where, upon the survey of a town site pursuant to section 732 of this title, and the regulations of the Department of the Interior under said section, a tract claimed and occupied by an Indian or Eskimo of full or mixed blood, native of Alaska, has been or may be set apart to such Indian or Eskimo, the town-site trustee is authorized to issue to him a deed therefor which shall provide that the title conveyed is inalienable except upon approval of the Secretary of the Interior: *Provided*, That nothing herein contained shall subject such tract to taxation, to levy and sale in satisfaction of the debts, contracts, or liabilities of the patentee, or to any claims of adverse occupancy or law of prescription: *Provided further*, That the approval by the Secretary of the Interior of the sale by an Indian or Eskimo of a tract deeded to him under this section and section 735 of this title shall vest in the purchaser a complete and unrestricted title from the date of such approval. (May 25, 1926, ch. 379, § 1, 44 Stat. 629.)

7. § 4 of the Alaska Statehood Act states:

As a compact with the United States said State and its people do agree and declare that they forever disclaim all right and title to any lands or other property not granted or confirmed to the State or its political subdivisions by or under the authority of this Act, the right or title to which is held by the United States or is subject to disposition by the United States, and to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives; that all such lands or other property, belonging to the United States or which may belong to said natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation: *Provided*, That nothing contained in this Act shall recognize, deny, enlarge, impair, or otherwise affect any claim against the United States, and any such claim shall be governed by the laws of the United States applicable thereto; and nothing in this Act is intended or shall be construed as a finding, interpretation, or construction by the Congress that any law applicable thereto authorizes, establishes, recognizes or confirms the validity or invalidity of any such claim, and the determination of the applicability or effect of any law to any such claim shall be unaffected by anything in this Act: *And provided further*, That no taxes shall be imposed by said State upon any lands or other property now owned or hereafter acquired by the United States or which, as hereinabove set forth, may belong to said natives, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restrictions on alienation.

ment cannot be taxed by the state or local government.

One of the questions here to be determined is whether the statutes also cause the houses and other improvements on the restricted lands to be non-taxable. In *United States v. Rickert*, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903) the U. S. Supreme Court held that the permanent improvements on an allotment issued under the General Allotment Act of 1887 (Dawes Act), 24 Stat. 389 (codified at 25 U.S.C. §§ 331–34, 336, 339, 341–42, 348–49, 381), could not be taxed by Roberts County in the State of South Dakota. The Court stated:

> While the title to the land remained in the United States, the permanent improvements could no more be sold for local taxes than could the land to which they belonged. Every reason that can be urged to show that the land was not subject to local taxation applies to the assessment and taxation of the permanent improvements.

> . . . . .

> The fact remains that the improvements here in question are essentially a part of the lands, and their use by the Indians is necessary to effectuate the policy of the United States.

*United States v. Rickert*, 188 U.S. at 442, 23 S.Ct. at 482. The principle of this case has even more force in the case of Native Allotments and Native Townsite lots because the General Allotment Act contained no express provision making the allotment tax exempt. The tax immunity of Indian Allotments has been implied from the restricted status of the land and the purpose which the United States attempted to effectuate in enacting the statute. Also the allotment in *Rickert* was no longer on a reservation[8] so state jurisdiction on an Indian reservation was not at issue.

Although *Rickert* depended in part on the federal instrumentality doctrine which has fallen into disfavor, *see Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 152–55, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973), the tax exempt status of improvements on tax exempt Indian land has been reaffirmed by the Court in *Mescalero Apache Tribe v. Jones* at 158–59, 93 S.Ct. 1267. In *Mescalero*, the Court was determining the validity of New Mexico's use tax on personalty used in the construction of the ski lifts on a resort run by a tribe on off-reservation land that was tax exempt. The Court held that the "use of permanent improvements upon the land is so intimately connected with use of the land itself that an explicit provision relieving the latter of state tax burdens must be construed to encompass an exemption for the former." *Mescalero Apache Tribe v. Jones* at 158, 93 S.Ct. at 1275–6.

In view of *Mescalero, Rickert* and the rule of construction resolving ambiguities in favor of Indians, this court holds that the United States has preempted the power of an Alaskan Borough to tax the land, homes or other permanent improvements on Alaskan Native Allotments or restricted lots in Native Townsites. The plaintiffs have cited much state law in arguing that the improvements are affixed to the land so as to enjoy the tax immunity given to the land. While state law concerning fixtures may be helpful as a guide in determining what is a "permanent improvement," the tax immunity question is a matter of federal law. *Walker River Paiute Tribe v. Sheehan*, 370 F.Supp. 816, 820 (D.Nev.1973). No state, of course, could remove the tax immunity by applying a narrow definition of fixtures or reclassifying the improvements as personal property. *See United States v. Rickert*, 188 U.S. at 442, 23 S.Ct. 478; *Mescalero Apache Tribe v. Jones*, 411 U.S. at 158, 93 S.Ct. 1267.

## Taxation of Personalty on Restricted Native Allotments and Native Townsites

The plaintiffs also contend that the Borough has no power to tax personalty owned by Native Alaskans who reside on the re-

---

8. The allotment had once been a part of the Sisseton Indian Reservation, *see* 26 Stat. 1035, 1036.

stricted allotments and townsite lots. The attack on this personalty taxation is two-fold: 1) that the statutes which grant the tax exemption to the allotments and townsite lots also pre-empt the power of the state to tax personal property of the residents and 2) that the federal government has exclusive jurisdiction over such taxation because the allotments and Native townsites are "Indian country." [9]

■ The canon of liberal construction cannot be taken so far as to make any property, including personalty, that is associated with the restricted lands or its residents likewise tax exempt. In *United States v. Rickert*, the Court also struck down the South Dakota tax on personal property, consisting of cattle, horses "and other property of like character." 188 U.S. at 443–44, 23 S.Ct. at 482. The Court's rationale appears to be based on the fact that "[t]he personal property in question was purchased with the money of the Government and was furnished to the Indians in order to maintain them on the land allotted during the period of the trust estate . . .", 188 U.S. at 443, 23 S.Ct. at 482–3, and "was put into the hands of the Indians to be used in execution of the purpose of the Government in reference to them." 188 U.S. at 444, 23 S.Ct. at 483. The Court's reasoning does not reach the personality involved in this case. There is nothing in the record to indicate the personal property was provided by the government for a particular purpose. The Native Allotment Act or the Native Townsite Act do not pre-empt the Borough's taxation of personal property associated with these restricted lands.

The second argument of the plaintiffs is much more difficult because of the conflicting decisions relating to what is "Indian country" in Alaska, the historical differences present in Federal policy toward Alaskan Natives, and the doctrinal confusion caused by one of the principal Indian jurisdictional cases that has emerged from Alaska.[10]

■ The plaintiffs cite numerous cases in which a state has been found not to have jurisdiction to tax the income or property of Indians. *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) (Flathead Reservation, Montana); *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (Leach Lake Reservation, Minnesota); *McClanahan v. Arizona Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (Navajo Reservation, Arizona); *Makah Indian Tribe v. Clallam County*, 73 Wash.2d 677, 440 P.2d 442 (1968) (Makah Reservation, Washington). These cases demonstrate the jurisdictional presumption that exists in Federal Indian law that a state has no jurisdiction over Indians on a reservation unless it has been explicitly granted that jurisdiction. The best statement of this presumption appears in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). In *Mescalero* the Court stated that "in the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian *reservation* lands or Indian income from activities carried on within the boundaries of the *reservation*." 411 U.S. at 148, 93 S.Ct. at 1270. (emphasis added)

The plaintiffs contend that this presumption applies in "Indian country" and that the Native Allotments and townsite at South Naknek are "Indian country." The definition of "Indian country" that appears in 18 U.S.C. § 1151 (1976) includes "depend-

9. This argument was also advanced as an alternative ground for the invalidity of the Borough's taxation of homes and improvements. Since the court has found that tax invalid on the ground of federal pre-emption it was unnecessary to discuss the "Indian country" jurisdictional argument with reference to the homes and improvements. The discussion of "Indian country" jurisdiction that follows would apply as well to the tax on homes and improvements.

10. *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). See the critique of *Kake* in Barsh, *The Omen: Three Affiliated Tribes v. Moe and the Future of Tribal Self-Government*, 5 American Indian L.Rev. 1, 8–12 (1977).

ent Indian communities" and "Indian allotments, the Indian titles to which have not been extinguished . . . ." in addition to reservation land.[11] Both the courts and the Congress have long been troubled in applying the term "Indian country" to Alaska. *Compare Petition of McCord*, 151 F.Supp. 132, 17 Alaska 162 (1957) (Native Village of Tyonek is "Indian country") *with United States v. Booth*, 161 F.Supp. 269, 17. Alaska 561 (1958) (Metlakatla Reservation not "Indian country".)[12] The Congress reacted to the *McCord* decision by amending Public Law 83–280, 67 Stat. 588–590, to give the Territory of Alaska jurisdiction over "All Indian country within the Territory." 28 U.S.C. § 1360(a) (1976)[13]. *See* Senate Rep. No. 1872, *as reprinted in* United States Code, Congressional and Administrative News, pp. 3347–49, 85th Cong., 2nd Sess. (1958).

This court does not have to decide whether the Village of South Naknek is within "Indian country." As noted above every

case brought to the court's attention in the area of taxation involved state taxation of property or activity within the exterior boundaries of an Indian reservation. This court's examination of the decisions indicates that the presumption of no state jurisdiction does not arise off-reservation.

■ In *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) the Court held that the State of Alaska could apply its anti-fish trap law to Native fishing not within an Indian reservation. This case is difficult because it discusses at length the rules developed for allowing state jurisdiction on an Indian reservation and then holds that "State authority over Indians is yet more extensive over activities, such as in this case, not on any reservation." 369 U.S. at 75, 82 S.Ct. at 571. The companion case of *Metlakatla Indian Community v. Egan*, 369 U.S. 45, 82 S.Ct. 552, 7 L.Ed.2d 562 (1962) held that

---

**11.** 18 U.S.C. § 1151 states:

 Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. June 25, 1948, c. 645, 62 Stat. 757; May 24, 1949, c. 139, § 25, 63 Stat. 94.

 This definition is found in the criminal code and is used principally in determining exclusive federal jurisdiction under the Major Crimes Act, 18 U.S.C. § 1153 (1976). This section originally referred only to Indian reservations but was expanded to include judicial constructions of the term found in *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), *United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), (*McGowan* and *Sandoval* involved non-reservation dependent Indian communities), and *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914) (allotment held in trust no longer within Colville Reservation, Washington). *See also United States v. John*, 437 U.S. 634, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978).

 In *DeCoteau v. District County Court*, 420 U.S. 425, 425 n. 2, 95 S.Ct. 1082, 1084 n. 2, 43 L.Ed.2d 300 (1975) the Court states that 18 U.S.C. § 1151 "generally applies as well to questions of civil jurisdiction." This dictum in a footnote does not settle the issue of the extent to which the definition of "Indian Country" in the criminal statutes applies to a question of tax jurisdiction. In addition, the authority for this proposition cited by the Court does not support it.

**12.** In *Kie v. United States*, 27 F. 351 (C.C.Or. 1886) it was held that the Territory of Alaska as a whole was not "Indian country" as the term was used in the Act of June 30, 1834, 4 Stat. 729 (repealed). This opinion appears obsolete to the extent that its holding relies on the statement, "Nor is it at all probable that the aborigines of Alaska can or will be considered as . . . having any title to the soil of the country, to be extinguished by the United States, as were the Indian tribes north and west of the Ohio River." 27 F. at 354. This proposition has been completely repudiated by the decisions in *Tlingit and Haida Indians of Alaska v. United States*, 177 F.Supp. 452, 147 Ct.Cl. 315 (1959), 389 F.2d 778, 182 Ct.Cl. 130 (1968) and the Alaska Natives Claims Settlement Act, 43 U.S.C.A. § 1601–28 (Supp.1978).

**13.** 28 U.S.C. § 1360 contains the cession of civil jurisdiction. 18 U.S.C. § 1162 contains the cession of criminal jurisdiction. The criminal provision excepts the Metlakatla Reservation.

Alaska could not regulate fish traps within the reservation boundaries. Comparison of the results in *Metlakatla* and *Kake*,[14] examination of the cases cited by the plaintiff, and subsequent judicial application of *Kake* indicate that the presumption of no state regulatory or tax jurisdiction does not arise off-reservation. In *Mescalero Apache Tribe v. Jones* after the Court had stated that the state could not tax on an Indian reservation absent federal consent, the Court went on to state a different rule for the off-reservation situation.

But tribal activities conducted outside the reservation present different considerations. "State authority over Indians is yet more extensive over activities . . . not on any reservation." *Organized Village of Kake, supra,* [369 U.S.] at 75, [82 S.Ct. at 571.] Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State. *See, e. g., Puyallup Tribe v. Department of Game,* 391 U.S. 392, 398, [88 S.Ct. 1725, 1728, 20 L.Ed.2d 689] (1968); *Organized Village of Kake, supra,* [369 U.S.] at 75–76, [82 S.Ct. 562, 570–1]; *Tulee v. Washington,* 315 U.S. 681, 683, [62 S.Ct. 862, 863, 86 L.Ed. 1115] (1942); *Shaw v. Gibson-Zahniser Oil Corp.,* 276 U.S. 575, [48 S.Ct. 333, 72 L.Ed. 709] (1928); *Ward v. Race Horse,* 163 U.S. 504, [16 S.Ct. 1076, 41 L.Ed. 244] (1896). That principle is as relevant to a State's tax laws as it is to state criminal laws, see *Ward v. Race Horse, supra,* at 516, [16 S.Ct. 1076, 1080] and applies as much to tribal ski resorts as it does to fishing enterprises. See *Organized Village of Kake, supra.*

411 U.S. at 148–49, 93 S.Ct. at 1270–1. *See also United States v. Mason,* 412 U.S. 391, 396 n. 7, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973); *Moses v. Kinnear,* 490 F.2d 21, 26 (9th Cir. 1974).

In addition, Federal policy toward Alaskan Natives generally has not followed the policy of providing for the Natives by establishment of Indian reservations. There were but few exceptions to this policy. *Metlakatla Indian Community v. Egan,* 369 U.S. at 51, 82 S.Ct. 552. R. Arnold, Alaska Native Land Claims 86–87, 106 (1978). The policy of not establishing reservations in Alaska found support in both the Native and non-Native community. *See United States v. Libby, McNeil & Libby,* 107 F.Supp. 697, 14 Alaska 37 (1952). "Because of the restriction of native activities which accompanied the reservation policy among the Indians of the continental United States, the natives of Alaska, with the exception of the transplanted colony of Metlakatla, have steadfastly opposed the development of reservations in Alaska. This opposition was part of an insistent resistance to racial discrimination." F. Cohen, Handbook of Federal Indian Law, 405 n. 70 (1942, second printing, Univ. New Mexico) (quoting U. S. National Resources Planning Board, Alaska, Its Resources and Development (1937)). The Congress has endorsed this policy in the Alaska Native Claims Settlement Act. In the declaration of policy in section two of the Act Congress declared that:

b) the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship

---

**14.** In analyzing the two cases the Alaska Supreme Court has said, "We deem it significant that the primary distinction drawn by Justice Frankfurter between the Metlakatlans and other Alaska Natives in *Metlakatla Indian Community v. Egan* and its companion case, *Organized Village of Kake v. Egan* is the existence of a reservation." *Atkinson v. Haldane,* 569 P.2d 151, 156 (Alaska, 1977) (citation omitted). The opinion in *Kake* itself stated, "The situation here differs from that of the Metlakatlans in that neither Kake nor Angoon has been provided with a reservation and in that there is no statutory authority under which the Secretary of the Interior might permit either to operate fish traps contrary to state law." *Organized Village of Kake v. Egan,* 369 U.S. at 62, 82 S.Ct. at 564.

or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States and Alaska.

43 U.S.C.A. § 1601 (Supp.1978). Although this policy statement refers to establishing a reservation system associated with the settlement of Native claims, no doubt the history of few reservations in Alaska had a part in persuading Congress to make the settlement without reservations. Section 19 of the Act revoked all reservations previously established with the exception of the Annette Island Reserve (Metlakatla Indian Community). 43 U.S.C.A. § 1618 (Supp. 1978). Acceptance of plaintiffs' contentions would have the effect of creating reservation-type tax immunities in Native villages all across Alaska, a result that Congress never intended.

■ A Native townsite is not the equivalent of a reservation, *United States v. Libby, McNeil & Libby*, 107 F.Supp. 697, 702, 14 Alaska 37 (1952), and the Borough can tax in a Native townsite or on an allotment unless the Congress has prohibited such taxation. There are no federal statutes which prohibit personal property taxation in a Native townsite or on an allotment. Section four of the Statehood Act states that Native property held in trust by the United States "shall be and remain under the absolute jurisdiction and control of the United States." This "absolute jurisdiction" language has been interpreted not to mean "exclusive jurisdiction," *Organized Village of Kake v. Egan*, 369 U.S. at 67–71, 82 S.Ct. 562, 571 and therefore is not a prohibition on state and local taxation. Nor could Public Law 83–280, 28 U.S.C. § 1360 (1976), be interpreted as a prohibition on state and local taxation. Public Law 280 was intended as a grant of jurisdiction not as a prohibition on exercising jurisdiction the state would otherwise possess. *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), which held that Public Law 280 did not grant Minnesota the power to tax personalty on the Leach Lake Reservation, is not to the contrary. *Bryan* simply takes a narrow view of what was granted by Public Law 280 and does not turn Public Law 280 into a prohibitory statute.

■ In conclusion, the court holds that the Bristol Bay Borough is not prohibited from taxing personal property associated with either an Alaskan Native allotment or an Alaska Native townsite.

■ The question remaining on this summary judgment motion relates to when the tax immunity on the land and improvements on Native allotments and Native townsite lots commenced operation as to protect these plaintiffs. Plaintiffs' brief is persuasive in its contention that the immunity protected the Native residents of South Naknek since 1957 when they petitioned for Native townsite status. The immunity on an allotment would arise at the time of the first use and occupancy that is the basis of the Native's allotment claim.

Accordingly IT IS ORDERED:

1. THAT plaintiffs' motion for summary judgment is granted in part and denied in part.

2. THAT the plaintiffs shall submit to the court by March 23, 1979, a declaratory judgment consistent with this opinion finding the Borough taxation of land and improvements on restricted Native townsite lots and Native allotments invalid and by the same date submit a permanent injunction enjoining the Borough from levying real property taxes on any such land and improvements.